**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL ACTION NO. 5:19-CR-00205-KKC**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **UNITED STATES' MEMORANDUM ON UNRESOLVED OBJECTIONS TO THE PSR**

**CARLOS ROGERS** **DEFENDANT**

*************

The defendant, Carlos Rogers, has objected to certain portions of the United States Probation Office's Presentence Investigative Report ("PSR"). The United States of America submits its position on the disputed portions of the PSR below.

The United States concurs with the Probation Officer's determination that Rogers's Total Offense Level is 13 for Count 1 and that Rogers's Criminal History Category is I. [PSR ¶¶ 33-50.] Rogers's applicable Guidelines range is therefore 12-18 months. [*Id.* ¶ 67.] The Court should reject Rogers's unresolved objections to the loss amount (Objection 2), mitigating role (Objection 3) and Guidelines range calculation (Objection 4) because – as explained by the Probation Officer in the Addendum to the PSR and by the United States below – the objections are contrary to the applicable facts and law.

## BACKGROUND

On December 5, 2019, a grand jury sitting in the Eastern District of Kentucky returned a five-count Indictment, charging Rogers with (1) conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); (2) wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two and Three); and (3) health care fraud, in violation of 18 U.S.C. § 1347 (Counts Four and Five). [PSR ¶¶ 1-3; R. 1: Indictment.] The Indictment also charged Correll Buckhalter ("Buckhalter") with conspiracy to commit health care fraud and wire fraud (Count One). Buckhalter pleaded guilty on June 11, 2020. [R. 52: Minute Entry for Rearraignment.]

On November 30, 2020, Rogers pleaded guilty to Count One of the Indictment (conspiracy to commit health care fraud). [PSR ¶ 4; R. 71: Minute Order.] Pursuant to a plea agreement, the United States agreed to move to dismiss Counts Two and Three (wire fraud) and Four and Five (health care fraud) at sentencing. [R. 73: Plea Agreement ¶ 1.]

Rogers is a former player in the National Football League ("NFL") whose career spanned ten seasons, from 2005 through 2014. During that time, Rogers was paid approximately $37,442,125. [PSR ¶ 61.] His relatively lengthy NFL career (greater than three seasons) qualified him to be a Participant in the Gene Upshaw NFL Player Health Reimbursement Account Plan ("the Plan"), a health care benefit program established pursuant to the 2006 Collective Bargaining Agreement between the NFL Management Council and NFL Players Association. The Plan was established to assist

certain former NFL players and their families pay for health care costs after the player's retirement. The Plan reimburses its Participants, their spouses and dependents for out-of-pocket medical care expenses up to a maximum of $350,000. The Plan is funded solely through contributions by the NFL teams, not the players, and any benefits remaining at the time of a former player's death pass to his spouse and other dependents. [PSR ¶¶ 7-11.]

Participants were not taxed when benefits became available to them under the Plan, nor were they taxed on reimbursements, so long as the reimbursements were for actual Medical Care Expenses incurred by the Participants or their families. If the Plan allowed reimbursements to Participants for expenses other than Medical Care Expenses – for example, cash payments not associated with any Medical Care Expenses – the Plan could lose its tax-favored treatment, and Participants in the Plan could be subject to taxation on their reimbursements. [*Id.* ¶ 11.]

The NFL Player Benefit Office provided all Participants with a Summary Plan Description ("SPD"), which, among other things, summarized the Plan, including the purpose of the Plan, what items or services were covered by the Plan, and how to submit claims to the Plan. The SPD was also available to Participants online at the Plan's website. The SPD specified certain types of Medical Care Expenses that are not covered under the Plan, including "[p]ayments for services not yet provided." [*Id.* ¶¶ 13-14.]

In pleading guilty, Rogers admitted that, from March 2018 through July 2018, he conspired with Buckhalter, Anthony Montgomery ("Montgomery") and others to defraud

the Plan by submitting or causing the submission of false and fraudulent claims that sought reimbursements for expensive medical equipment that was never actually purchased or received. [R. 73-1: Factual Basis to Plea Agreement.] The claims, which were submitted by Buckhalter, included falsified prescriptions, letters of medical necessity and invoices. *Id*. These claims sought reimbursement for items that were not medically necessary and were not actually provided. [PSR ¶ 27.]

Rogers further admitted that he recruited other vested members of the Plan into the scheme and assisted them in causing the false and fraudulent submissions of claims to the Plan. [R. 73-1: Factual Basis to Plea Agreement.] Specifically, Rogers assisted Buckhalter and others in causing the submission of four false and fraudulent claims through his communications with those members, and by providing their personal identifying information to Buckhalter so that the claims could be submitted. *Id*. The four members for whom false and fraudulent claims were submitted were Montgomery, M.K., B.P. and M.C. [PSR ¶ 27.]

The evidence shows that Rogers recruited these members, knew the amount of each of their claims, specified the amount of the kickback/bribe required to have the claim submitted, and checked in on the status of the false and fraudulent claims. For example, a text message exchange between Rogers and Montgomery on or around March 26, 2018, shows that Rogers recruited Montgomery into his scheme with Buckhalter and away from a separate, similar scheme involving Robert McCune ("McCune"), John Eubanks

("Eubanks") and others that is the subject of a separate indictment.[1] Rogers explained to Montgomery the kickback/bribe required, and he discussed the alleged involvement of a doctor to defraud the Plan:

| | |
|---|---|
| Rogers: | Quick question have you taken out your HRA money |
| Montgomery: | Yep |
| Rogers: | Ok just making sure cause I got a doctor that can get you 56k |
| Montgomery: | I'm ready to do my second go round. Ubanks [sic] doctor been dragging his feet<br>What he charge? |
| Rogers: | 6k<br>Will hv your ck next week |
| Montgomery: | Anthony Montgomery<br>[Date of Birth]<br>[Address]<br>[Cigna ID Number]<br>[Social Security Number] |

[Ex. 1.] The personal information that Montgomery provided to Rogers matched the personal information listed in the false and fraudulent claim submitted to the Plan on Montgomery's behalf two days later (March 28, 2018). [*See* Ex. 2.]

Similarly, in a text message exchange between Rogers and M.K. on or around April 23, 2018, regarding the submission of claims for B.P. and M.C., Rogers explained that new

---

[1] Eubanks has pleaded guilty to Count One (conspiracy to commit health care fraud) of a separate indictment that alleges a similar scheme to the one charged in the Indictment in this case. Eubanks pleaded guilty to recruiting players into that scheme. *See United States v. McCune*, No. 5:19-CR-00206-KKC (R. 152-1). Montgomery has also pleaded guilty to Count One of that separate indictment and has admitted to conspiring with Rogers and Buckhalter, as well as Eubanks and Robert McCune. *See United States v. McCune*, No. 5:19-CR-00206-KKC (R. 273-1).

claims would be submitted in the amount of $46,000 instead of $56,000 because the higher claim amounts had been taking too long to be paid:

> Rogers: Naw he only [d]oing 46 cause 56 been taking too long to repay. It's been backed up. But he said he will do another 10k, 2/3 weeks after they get there check. . . .
>
> So it's still gonna be the same. They just will get the 10k, 2/3 week later. The last few 56 he been doing was taking 3 weeks to repay so he just stopping that large amount for a min and just breaking it down.

[Ex. 3 at 2, 5.] On or around May 1, 2018, a false and fraudulent claim was submitted to the Plan on B.P.'s behalf for a $46,821 cryotherapy machine. [Ex. 4.]

The vested members of the Plan that Rogers recruited into the scheme paid Buckhalter the prescribed kickbacks/bribes. Buckhalter then paid a portion of that kickback/bribe to Rogers, in return for facilitating the false claims. [PSR ¶ 27.] Rogers directed Buckhalter to transfer the kickbacks/bribes to his (Rogers's) wife, suggesting that he wanted to conceal the kickback/bribe payments. [*See* Ex. 5.] The total amount of kickbacks/bribes paid to Rogers through his wife was $6,500. [*See id.*; PSR ¶ 27.]

As a result of Rogers's participation in the scheme, the Plan was billed approximately $179,814 for the four false and fraudulent claims submitted on behalf of Montgomery, M.K., B.P. and M.C. These claims sought reimbursement for items that were not medically necessary and that were not actually provided, and the Plan paid one of those false and fraudulent claims in the amount of approximately $56,821. The $56,821

was subsequently paid back to the Plan by the vested member on whose behalf the false and fraudulent claim was submitted. [PSR ¶ 27.]

**ARGUMENT**

The Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Accordingly, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

In calculating the appropriate sentence under the Guidelines, the Court considers as relevant conduct the acts of the defendant, as well as the acts "willfully caused by the defendant" and "all harm that resulted from the acts and omissions." U.S.S.G. § 1B1.3. Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The Guidelines define a "common scheme or plan" as any other offense substantially connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id*. § 1B1.3 cmt. n.9(A). "The burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

Here, there are three unresolved objections to the PSR that impact Rogers's Guidelines range[2]: (1) the loss amount under Section 2B1.1(b)(1); (2) the applicability of a four-level adjustment based on Rogers's alleged mitigating role under Section 3B1.2; and (3) the proper calculation of the Guidelines range, based on the prior two objections. The United States addresses each in turn.

## I. Objection 2: The Court Should Adopt the Loss Amount Recommended in the PSR and Reject Rogers's Objection that Actual Loss Should Apply.

In fraud cases, a defendant's offense level is adjusted based on the amount of loss involved in the offense. *See* U.S.S.G. § 2B1.1(b)(1). The district court is to determine the amount of loss by a preponderance of the evidence. *See United States v. Ashrafkhan*, 821 Fed. App'x 428, 444 (6th Cir. 2020). "The court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n.3(C), and "[p]recision is not required." *United States v. Sufi*, 456 F. App'x 524, 528 (6th Cir. 2012).

The amount of loss for sentencing purposes "is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n. 3(A). The Guidelines define "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict . . . and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id*. § 2B1.1 cmt. n. 3(A)(ii).

[2] Rogers's Objection 1 has been resolved in the Addendum to the PSR, and it does not affect his sentencing guidelines.

In health care fraud cases, the intended loss amount typically corresponds to the total amount of claims or bills submitted to the relevant health care benefit program, particularly where the claims were expected to be paid in full and no health care benefits, items or services were provided. *See, e.g.*, *United States v. Bertram*, 900 F.3d 743, 752 (6th Cir. 2018) (upholding the district court's determination that "the intended loss amount was best represented by the amount billed" to private insurer Anthem); *United States v. Patel*, 579 F. App'x 449, 455 (6th Cir. 2014) (upholding the district court's determination of loss amount that took into account the defendant's "billings to Medicare, Medicaid, and Blue Cross/Blue Shield of Michigan"); *United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013) (upholding the district court's calculation that loss should include the total amount billed to Medicare where the record "contains no evidence that . . . any services . . . were actually provided to patients").

Here, Paragraph 34 of the PSR and the Addendum properly conclude that the loss amount for purposes of Section 2B1.1(b)(1) is the total amount of the four false and fraudulent claims that Rogers assisted in submitting to the Plan: $179,814. [PSR ¶ 34; Addendum ("PSR Add.") at 19-20.] As the Probation Officer noted, Rogers admitted in his plea agreement (which Rogers affirmed at his re-arraignment) that he (i) knowingly and willfully conspired to defraud the Plan, (ii) agreed with Buckhalter and others to submit and cause the submission of false and fraudulent claims to the Plan for high-dollar-value durable medical equipment that was never actually provided and that was not medically

necessary, (iii) recruited four vested members into the scheme and assisted them in causing four false and fraudulent claims to the Plan in the amount of $179,814, and (iv) received kickbacks/bribes from Buckhalter in exchange for facilitating the submission of the claims. [R. 73-1: Factual Basis to Plea Agreement at 2-4; PSR Add. at 19-20.]

In addition, Rogers's text messages to Montgomery and M.K. show that Rogers knew the amount of each false and fraudulent claim ($46,000 to $56,000), that a doctor was needed to help defraud the Plan, and that the false and fraudulent claims were submitted just to obtain money, not to secure reimbursement for actual medical equipment. [*See supra* at 5-6; Exs. 1, 3.]

Under the Guidelines, the intended loss is undoubtedly the full amount of the four false and fraudulent claims Rogers helped to submit: $179,812. This is the loss amount that should apply under Section 2B1.1(b)(1). *See* U.S.S.G. § 2B1.1 cmt. n. 3(A).

The Court should reject Rogers's objections that an actual loss figure should apply because (i) Rogers believed that the Plan funds belonged to the players for whom false and fraudulent claims were submitted to the Plan and (ii) Rogers did not know how much money was being claimed. [*See* PSR Add. at 19.] Neither holds water.

***"The funds belonged to the players***." Rogers's claim that he believed the Plan funds belonged to the players is belied by the facts of this case, where Rogers has pleaded guilty and admitted to knowingly and willfully conspiring with Buckhalter and others to defraud the Plan by facilitating the submission of false and fraudulent claims to it. [R. 73-

1: Factual Basis to Plea Agreement at 3-4; PSR Add. at 19-20.] It also defies common sense to suggest that Rogers, Buckhalter, and others would engage in this scheme (and demand/pay a share of the proceeds) if they believed that they owned the funds and could simply take them out of the Plan as they would take money out of a bank account. Indeed, Rogers's argument that he believed the stolen money actually belonged to the players is inconsistent with his guilty plea and request for a downward adjustment for acceptance of responsibility.

***"Rogers did not know the amount of the claims***." Similarly, Rogers's argument that he did not know the amounts of the claims he conspired to submit is undermined by his own statements in the text messages discussed above. [*See supra* at 5-6; Exs. 1, 3.] These messages show that he knew, before the false and fraudulent claims were submitted to the Plan, that each claim sought between $46,000 and $56,000. This is sufficient to show that $179,812 is the amount of "pecuniary harm that the defendant purposely sought to inflict . . . ." USSG § 2B1.1 cmt. n. 3(A). Indeed, the Court should note that the United States has not sought to hold Rogers responsible for all $1,297,560 in false and fraudulent claims that Buckhalter submitted or caused to be submitted in the conspiracy overall. [PSR ¶ 29.] Instead, the loss amount set forth in Rogers's PSR is a conservative accounting that limits Rogers's responsibility to only the claims in which he was directly involved.

The three cases cited by Rogers are inapposite and do not change the analysis. In *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011), *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003), and *United States v. Moored*, 38 F.3d 1419, 1427 (6th Cir. 1994), the courts found that there was insufficient evidence to establish the quantum of loss that the defendant intended to inflict. Here, there is ample evidence that Rogers intended to cause $179,812 in loss. He admitted to conspiring to defraud the Plan, and the evidence shows that he knew the amount by which he and his co-conspirators would attempt to obtain: four claims, each for between $46,000 and $56,000. In such a situation, the intended loss should be the total amount of false and fraudulent claims Rogers conspired to submit to the Plan. *See Bertram*, 900 F.3d at 752; *Patel*, 579 F. App'x at 455; *Mahmud*, 541 F. App'x at 636.

## II. Objection 3: The Court Should Reject Rogers's Objection that a Mitigating Role Adjustment Should Apply.

Section 3B1.2 of the Sentencing Guidelines authorizes a court to adjust a defendant's offense level if he had a mitigating role in the offense. Specifically, it permits a four-level reduction if the defendant can show that he was a "minimal participant," which is defined as someone who is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2(a) & cmt. n. 4. Section 3B.1.2 also permits a two-level reduction if the defendant can show that he was a "minor participant," which is defined as someone who is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(a) & cmt.

n. 5. Section 3B1.2 also authorizes a three-level reduction if the defendant can show that he falls somewhere in between. U.S.S.G. § 3B1.2. For any mitigating role adjustment to apply, a defendant must show that he was "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n. 3; *United States v. Romero*, 704 F. App'x 445, 449 (6th Cir. 2017). A "'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.2 cmt. n. 1; U.S.S.G. § 3B1.1 cmt. n. 1.

"[I]n determining whether to grant a mitigating reduction, the district court must consider the portion of the relevant conduct of the conspiracy that was attributable to the defendant for purposes of determining his base offense level. In other words, a defendant's role in the offense is measured in comparison to other participants in that relevant conduct." *Romero*, 704 F.App'x at 451 (internal quotations and citations omitted).

The Sentencing Commission has provided a list of five non-exhaustive factors for sentencing courts to consider in determining whether a mitigating role adjustment applies:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n. 3(C). The defendant bears the burden of proving a mitigating role by a preponderance of the evidence. *United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000).

Here, Paragraph 37 of the PSR and the Addendum properly conclude that no mitigating role adjustment applies. [PSR ¶ 37; PSR Add. at 22-23.] As the Probation Officer noted, Rogers admitted to recruiting four members into the scheme to defraud: Montgomery; M.K.; B.P.; and M.C. After recruiting those members, Rogers forwarded their personal information to Buckhalter so that false and fraudulent claims could be submitted to the Plan on their behalf. Due to this conduct, four claims totaling $179,814 were submitted to the Plan, and Rogers received $6,500 in kickbacks/bribes. [PSR Add. at 22-23; R. 73-1: Factual Basis to Plea Agreement at 2-4.] Thus, Rogers is not substantially less culpable than the average participant. [PSR Add. at 22-23.]

An analysis of the five non-exhaustive factors set forth in Application Note 3(C) of Section 3B1.2 supports this conclusion. First, Rogers understood the scope and structure of the criminal activity. Indeed, text messages exchanged between Rogers and Montgomery in March and April 2018 demonstrate this fact:

Montgomery: What bro!! Did they send it off yet?

Rogers: Yea think it was sent off Friday. So I guess you will get your ck this Friday coming . . . .

Montgomery: Did they tell you a date that it would be sent?

Rogers: Naw I'll hit him up. I know 2 boys was sent a couple days later than normal cause of Easter. But I'll ck for you.

Montgomery: Ok

Rogers: Did you ck and see if it was out of your acct yet.

Montgomery: I did but it wasn't. I think it don't come out until you cash it

Rogers: Oh ok.

Montgomery: Did they give you any update?

Rogers: Let me hit him. I know it was back up. Cause my boy Lac just got his ck Friday and his was in 3/4 days b4 yours. But I'll hit him. . . .

He said you should hv your ck this week. He said Cigna process sm fast and smtn depending on if it's a holiday it may be a li slower. One of my boys filed his shit on a tues and got paid the next thur.

Montgomery: Oh ok. Good looking

Rogers: Bro did you ck your acct to see if they took the money out of your acct.

Montgomery: I did. They didn't

Rogers: Let me text this doctor again cause this close to two weeks with yours rt. . . .

Montgomery: He ever get back with you

Rogers: Not yet. I'll text him again. 2 days ago he said it was in process and they was slow. But I'll text. Him again. If smtn was wrong he would've hit me.

Montgomery: Aight

Rogers: What's good homie, tell Montgomery he's still in processing, hopefully they cut the check this week

Dude called today and Cigna said it's almost finalized and they're backed. I'm sorry about that. It's out of my control. But I been calling trying to get it pushed thru fast.

That's what he text me. I was just sending it to you.

[Ex. 1.] Rogers thus knew the process for submitting the false and fraudulent claims and that several other players were also participants in the scheme; he even claimed that a doctor was involved in the claims and stated that Cigna was reviewing them.

Second, Rogers helped organize the criminal activity by recruiting other participants into the scheme, checking on their false and fraudulent claims and keeping the other participants updated.

Third, Rogers influenced decision-making authority by coordinating with Buckhalter and recruiting other participants into the scheme to defraud and away from another similar scheme.

Fourth, Rogers interacted with multiple other participants in the scheme and enlarged it by recruiting. Indeed, recruitment of accomplices is a factor courts consider in deciding whether to apply an ***aggravating*** role. *See* U.S.S.G. § 3B1.1 cmt. n. 4.

Fifth, and finally, Rogers was paid thousands of dollars for his contributions to the scheme to defraud.

Rogers's objection that a mitigating role should apply lacks merit. As a preliminary matter, Rogers is incorrect in arguing that his role should be measured by reference to all participants in two different schemes to defraud. [*See* PSR Add. at 20.] His role should be measured against the participants in the offense conduct attributable to him for purposes of determining his base offense level. *See Romero*, 704 F.App'x at 451. Rogers's role is more culpable than – or at least as culpable as – Montgomery's, M.K.'s,

B.P.'s and M.C.'s, all of whom Rogers recruited into the scheme to defraud. Indeed, each only had one claim submitted on his behalf in the conspiracy charged in this case, whereas Rogers facilitated all four.

In addition, Rogers's argument that his role was less culpable than that of the scheme's leaders, including Buckhalter, does not entitle him to a mitigating role adjustment. As noted, Rogers must show that he is "substantially less culpable than the ***average*** participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n. 3(A) (emphasis added). Rogers cannot do so because, as a recruiter, he is more culpable than – or at least as culpable as – the average participant who provided information so that a claim could be submitted on his behalf. This conclusion is true whether Rogers's conduct is compared with only the participants in his relevant conduct or with participants in the scheme overall.

## III. Objection 4: The Court Should Reject Rogers's Objection that the Guidelines Calculation Should Conform to Objections 2 and 3.

As discussed above, Rogers's Objections 2 and 3 should be rejected. As a result, Objection 4 should also be rejected because it relies on the Guidelines calculations that Rogers proposes in Objections 2 and 3. As the Probation Officer correctly concluded, Rogers's Total Offense Level is 13 for Count 1; Rogers's Criminal History Category is I; and Rogers's applicable Guidelines range is 12-18 months. [PSR ¶¶ 33-50; ¶ 67.]

## CONCLUSION

For the reasons stated above, the United States submits that the Court should deny Rogers's unresolved objections to the PSR.

.

Respectfully submitted,

CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY

/s/ Andrew E. Smith
Andrew E. Smith
Assistant United States Attorney
260 W. Vine St., Suite 300
Lexington, KY 40507
Tel: (859) 685-4849
Andrew.e.smith@usdoj.gov

DANIEL S. KAHN, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

/s/ John ("Fritz") Scanlon
John ("Fritz") Scanlon
Alexander J. Kramer
Trial Attorneys
U.S. Department of Justice, Criminal Division
1400 New York Avenue NW
Washington, DC 20530
Tel: (202) 304-2946 (Fritz Scanlon)
Tel: (202) 768-1919 (Alexander Kramer)
Tel: (202) 768-1136 (Thomas Tynan)
john.scanlon@usdoj.gov
alexander.kramer@usdoj.gov

**CERTIFICATE OF SERVICE**

On April 15, 2021, I electronically filed this document through the CM/ECF system, which will send notice to counsel of record.

/s/ Andrew E. Smith
Assistant United States Attorney